*218 OPINION OF THE COURT
John M. Leventhal, J.
The People move to reargue this court’s prior decision (193 Misc 2d 725 [2002]).
Procedural History
On June 12, 2002, an indictment charging the defendant with various sex crimes was filed. By motion dated August 15, 2002, the People moved pursuant to CPL 240.40 (2) (b) (v) for an order directing the defendant to provide a blood sample for DNA testing. By cross motion dated September 20, 2002, the defendant consented to the taking of the blood sample, but sought an order of protection pursuant to CPL 240.50. By decision dated November 12, 2002, this court granted the cross motion. Finding good cause for the protective order, the court held that comparing the defendant’s DNA to uncharged crime scene DNA would constitute a violation of Executive Law § 995-d. The court declined to address the constitutional issues raised in the motion.[1]
The defendant has supplied the People with a blood sample for DNA testing and the defendant’s DNA has been compared with that found at the instant crime scene.
Although major portions of the People’s memorandum and the amicus brief focus on the constitutional issue, this court declines to decide the difficult constitutional issue (193 Misc 2d at 727).
The potential benefits to society from DNA research and its ramifications are in its infancy. DNA supplies information not only about the donor but also about the donor’s family (Wieder, Privacy Protection is Needed for DNA, 2002 L Rev Mich St U Det CL 927, 928; see KImmelman, Risking Ethical Insolvency: A Survey of Trends in Criminal DNA Databanking, Symposium, 28 JL Med & Ethics 209 [2000]). DNA information can be used to save lives, prevent diseases, identify missing persons, identify victims of disasters, convict the guilty and free the innocent. DNA profiles can determine paternity. Ge *219 netic information of an individual can be used to discriminate in employment, education, housing, and life and health insurance. Society is aware of the abuse of genetic information that had occurred in the last century. Sterilization laws were enacted in some parts of this country based on genetic defects (2002 L Rev Mich St U Det CL, at 928-929; see Buck v Bell, 274 US 200 [1927]) and one society attempted to use genetic knowledge to create a genetically superior race.
At this early stage, courts should not set in stone the constitutionality of DNA dragnets (see Grand, The Blooding of America: Privacy and DNA Dragnet, 23 Cardozo L Rev 2277 [Aug. 2002]; see Valdivieso, DNA Warrants: A Panacea for Old, Cold Rape Cases?, 90 Geo LJ 1009; Imwinkelried and Kaye, DNA Typing: Emerging or Neglected Issues, 76 Wash L Rev 413; Drobner, DNA Dragnets: Constitutional Aspects of Mass DNA Identification Testing, 28 Cap U L Rev 479), or undercover operations which follow suspects and obtain DNA material from glasses used by suspects in restaurants, from public drinking fountains or from hairs shed while walking on the street (see e.g. Symposium, Panel Two: Criminal Law and DNA Science: Balancing Societal Interests and Civil Liberties, 51 Am U L Rev 401, 409-410). Limitations on the governmental or private use of DNA information gathered by the above-described methods are more appropriately left to the Legislature which can hold hearings on the subject. The courts are ill-equipped to balance the beneficial uses of DNA data against the potential abuses of DNA profiles as required for a proper constitutional analysis (51 Am U L Rev 401, 405). Further, if this court has misinterpreted the import of the statute, the Legislature is free to modify the statute’s wording to conform to its true intent (see People v Damiano, 87 NY2d 477, 490 [1996]).
The New York State Legislature has addressed many of these and related problems in Executive Law article 49-B, Civil Rights Law § 79-1, CPL 440.30 (1-a), the Family Court Act sections dealing with paternity, and Public Health Law article 32-A.
For the purpose of this decision, the court uses the term “database” to mean locations containing numerically coded genotype identification information. “Databank” means the storage place of the original sample of DNA matter. “DNA index system” refers to the electronic or computerized indexing of DNA profiles (Kaye, The Constitutionality of DNA Sampling on Arrest, 10 Cornell JL & Pub Pol’y 455, 462; see also Execu *220 tive Law § 995-c [1] [computerized DNA identification index]). The phrase “defendant’s DNA profile” or “defendant’s DNA identification information” refers to the DNA information adduced from this court’s authorization for the taking of the blood sample.
DNA Information Regarding Nonconvicted Individuals
Britain, Canada, New Zealand and China permit the taking of materials containing DNA from arrestees or suspects who are alleged to have committed certain crimes (Stevens, Arresting Crime: Expanding the Scope of DNA Databases in America, 79 Tex L Rev 921, 949; Puri, An International DNA Database: Balancing Hope, Privacy, and Scientific Error, 24 BC Inti & Comp L Rev 341, 372-374). The United States Government prohibits the placing of DNA information of nonconvicted persons in the national DNA Index System called Combined Index System or CODIS (42 USC § 14132 [a] [1]). Any state failing to comply with the federal standards risks losing federal funding (Alfaro v Terhune, 98 Cal App 4th 492, 508, 120 Cal Rptr 2d 197, 209-210 [2002]). Any governmental official violating the federal statute in this area is committing a crime (42 USC § 14132 [c]). Also prohibited is the use of DNA information legally obtained under federal law for purposes other than specified by statute (42 USC § 14135 [e]). Thus, it appears to be national policy to prohibit the comparison of DNA identification information obtained from a nonconvicted person with crime scene DNA of unsolved crimes.
Louisiana, Mississippi, Kentucky, Texas and California authorize the taking of DNA samples from persons arrested for specified crimes (79 Tex L Rev 921, 948; Kaye, Two Fallacies about DNA Data Banks for Law Enforcement, 67 Brook L Rev 179, 180; 51 Am U L Rev 401, 410). In a letter dated October 12, 1999, former Mayor Rudolph Giuliani, in advocating the approval of the proposed legislation expanding the crimes for which DNA specimens may be taken, urged the New York Legislature to extend the law to all persons arrested for certain crimes. Former New York City Police Commissioner Howard Safir had often urged the New York State Legislature to expand the State DNA Index System to include persons arrested for certain crimes (10 Cornell JL & Pub Pol’y, at 458; 79 Tex L Rev, at 949-950). New York Senate Bill S 1795, introduced on January 30, 2001 and NY Assembly Bill A 4486, introduced on February 12, 2001 would authorize the taking of DNA specimens from certain persons arrested for specific *221 crimes (10 Cornell JL & Pub Pol’y, at 508 n 11; 67 Brook L Rev 179, 206 n 5). Despite these calls, Executive Law article 49-B prohibits the placing of DNA profiles obtained from nonconvicted persons in the State DNA Index System (SDIS).
OCME’s Indexing System
The Office of the Chief Medical Examiner (OCME) has two DNA indexing systems described as “databases” in the affidavit by Dr. Howard Baum, Deputy Director of OCME’s Department of Forensic Biology.
The first is a general DNA index system (GDIS). GDIS contains only DNA profiles from crime scenes that are determined to be from possible perpetrators. GDIS does not contain profiles of known witnesses, bystanders or victims. GDIS is connected to SDIS.
The second indexing system is called “linkage database.” Access to the “linkage system” is limited to a few employees of OCME and is in a secure facility. This “database” contains all the data contained in GDIS as well as DNA profiles of all suspects who have consented to supply DNA samples and DNA profiles of persons who have been ordered by the court to supply DNA specimens. This database is not connected to either CODIS or SDIS.
This court’s prior decision dealt mainly with the “linkage system.” It is important to remember that the primary function of the “linkage database” is to compare the DNA profile of nonconvicted individuals with crime scene DNA profiles from past crimes and with new DNA profiles from future crimes when entered into OCME’s database (see Nicholas v Goord, 2003 WL 256774, 2003 US Dist LEXIS 1621 [SD NY 2003]). It is presumed by this court that once there is a determination that there is a match between a nonconvicted person’s DNA profile and a crime scene DNA profile, the proper law enforcement agents will be contacted. This court does not accept the People’s contention made at oral argument that this information will be used solely for Molineux purposes.
Executive Law § 995-d
Since OCME is licensed by the State, it is subject to Executive Law § 995-d.[2] The plain language of the two subdivisions of section 995-d prohibits the disclosure or redisclosure of DNA information obtained as a result of DNA testing performed on *222 any person to any person or public agency, except to the prosecution, defense and court in a criminal proceeding. When OCME places defendant’s DNA profile in its “linkage database,” the information is revealed to any OCME employee who has access to this database and who is not working on the instant criminal proceeding. This is an unauthorized disclosure, especially when such OCME employee places other crime DNA profiles in the computer for comparison. If a comparison between other (than that involved in this case) crime scene DNA data matches the defendant’s DNA profile (cold hit), this will constitute a disclosure of the defendant’s DNA profile to the law enforcement agents handling the unsolved crime and violates Executive Law § 995-d. Even when there is no match, the defendant’s DNA profile is revealed as not matching the DNA data which has been inputted into the index system.
When there is a “cold hit,” the defendant’s DNA profile is “redisclosed” to the OCME employee for purposes other than the underlying criminal proceeding. This also contravenes the directives of Executive Law § 995-d. When OCME informs the Kings County Assistant District Attorney who is working on the instant indictment of the “cold hit,” this constitutes a “re-disclosing” for purposes other than this criminal proceeding (see discussion immediately below — Molineux).

Molineux

The People argue that even though they have no information that the defendant committed any other crime, if defendant’s DNA is compared to DNA profiles in the “linkage database,” defendant’s commission of an uncharged crime may be uncovered. If there should be such a “cold hit,” then conceivably the People would be able to develop a legal theory for the admission of uncharged crimes evidence. The argument then *223 proceeds if such a theory is developed, then perhaps a court will permit introduction of uncharged crimes evidence after balancing the appropriate factors. This type of fishing expedition is prohibited under CPL article 240 (see People v Gissendanner, 48 NY2d 543, 550 [1979], and its progeny). Thus, disclosure to the prosecution in this criminal proceeding of a “cold hit” is not relevant to this criminal proceeding and is illegal.
Further, the defense counsel has stated in the papers in opposition to the motion to reargue that the defense in this case is that the victim consented to the sexual activity. Thus, the Molineux exceptions, inter alia, of intent and identity are not applicable in this case. Moreover, the Court of Appeals has ruled that uncharged crimes evidence is not permitted to negate a defense of consent (People v Vargas, 88 NY2d 856, 857-859 [1996]). There is no possible use of any information discovered by a “cold hit” under Molineux.
Purpose of Discovery
Additionally, the purpose of CPL 240.40 (2) (b) (v) is to provide discovery for the pending criminal action, and not to permit the People to investigate unsolved crimes for which they have no reason to suspect a defendant. The People cannot be permitted to avoid constitutional restrictions, which require probable cause before a person’s blood may be extracted for DNA testing (Matter of Abe A., 56 NY2d 288 [1982]) under the guise of seeking discovery. In this case, if the defendant had not been indicted for this crime, the People would have been required to establish probable cause if they wished to test the defendant’s blood and to compare it to another unsolved crime. Instead, the prosecution wishes to use CPL article 240 to avoid the constitutional problem. The court finds the attempt to avoid constitutional restrictions under the facade of discovery improper.
Crime Scene DNA Profile
The parties’ arguments have centered on the permissibility of disclosing crime scene DNA profiles. This discussion is largely irrelevant. This case involves the issue of whether disclosure of the defendant’s DNA profile obtained through this court’s order is permitted, and not whether disclosure of crime scene DNA information is authorized. Nonetheless, because of the extensive briefing by the parties on this issue and because this issue supports the court’s ban on comparing the defen *224 dant’s DNA to uncharged and unsolved crime DNA, the court will discuss the issue.
The People argue that DNA identification information obtained from the crime scene is not the result of DNA testing “performed on a person,” and therefore not prohibited. Two arguments are made to support this theory.
First, the People claim that if DNA testing of crime scene matter is included in the confidentiality provisions of Executive Law § 995-d, the Legislature should not have restricted confidentiality to tests “performed on any person,” but should have used the broader phrase “any information derived from DNA testing” is confidential. The logical extension of this argument would require this court to find that selling or disclosing DNA data from crime scenes to insurance companies or private parties would not be prohibited under Executive Law § 995-d. Further, if material left at public places is not subject to Executive Law § 995-d because it is not “performed on a person,” then insurance companies could follow potential clients and obtain their DNA profile from material left in restaurants, public fountains, hairs dropped on the street or other DNA material left in public without violating any law. Such a reading would be contrary to the plain intent of the confidentiality provision.[3] Rather, the phrase “performed on any person” was inserted in the statute to exclude from its purview DNA testing performed on nonhumans (see Sensabaugh and Kaye, NonHuman DNA Evidence, 39 Jurimetrics J 1). Much DNA research is being done on animals and other nonhumans (id.). The statute does not prohibit the disclosure of DNA data of nonhumans; it does prohibit revealing DNA identification obtained from any human sample.
The second contention made by the People is that the Legislature’s intent in enacting the confidentiality provisions is to protect the expectation of privacy of the DNA subject. The People’s argument proceeds as follows: since a person has no expectation of privacy in DNA left at a crime scene, the statute’s confidentiality provisions do not cover crime scene DNA. In support of their position, the People cite numerous cases regarding the federal and state constitutional issue of expectation of privacy. The People do not supply any support *225 ing documents to buttress their legislative intent claim. The court has obtained and reviewed the legislative jacket for the statute.
Initially, the court observes that constitutional concepts and legislative intent are not always identical. Further, even if there is an equivalency, the United States Supreme Court has rejected the idea that there is an absence of an expectation of privacy in material left at a crime scene (Flippo v West Virginia, 528 US 11, 14 [1999]; Mincey v Arizona, 437 US 385 [1978]; Thompson v Louisiana, 469 US 17 [1984]). A crime scene can be a person’s home or other location where a citizen has an expectation of privacy. Material left at these crime scenes is not necessarily abandoned, as argued by the People. The prosecution thus must argue that Executive Law § 995-d applies to some crime scenes but not to other crime scenes. Since there is no language in the statute indicating different rules for different types of crime scenes, acceptance of the People’s argument would entail rewriting the confidentiality statute, which is an improper judicial function.
Notably, an examination of the various DNA statutes and legislative documents leads this court to conclude that while the Legislature was concerned with privacy, their intent in all the DNA legislation is much broader. Enlightening on the issue of legislative intent is the Memorandum of the Assembly in support of chapter 497 of the Laws of 1996 creating Civil Rights Law § 79-l and Insurance Law § 2612. The Assembly Memorandum reads in part, “the bill deems individuals to have an exclusive property right in records of tests of their genetic material, particularly against unauthorized release.” (Bill Jacket, L 1996, ch 497.) An examination of the numerous sections cited above indicates that the Legislature intended to give a DNA contributor a property right in the prevention of dissemination of genetic information.
A reading of Executive Law § 995-d supports this property right. The repeated use of the phrase “without the consent of the subject of such DNA testing” indicates that the Legislature intended that the contributor should control dissemination of genetic information, and permit disclosure only for the particular need for which the DNA test was authorized. The particular authorized need in this case is to compare the defendant’s DNA profile with that found at the scene of the crime involved in the instant indictment and not some past or future crime scene. Comparing the defendant’s DNA data to other crime scenes violates the defendant’s “exclusive property right” to control the dissemination of his genetic makeup.
*226 Additional support for the court’s interpretation is contained in subdivision (2) of Executive Law § 995-d.[4] The statute provides for disclosure of DNA records contained in locations “other than DNA records maintained in the state DNA identification index.” OCME’s “linkage database” is a DNA record maintained in a location other than SDIS. Thus, the “linkage database” is covered by this statute. The statute permits disclosure “to the court, the prosecution, and the defense.” By enumerating the persons authorized to receive the information, the Legislature has limited the persons who have access to the data. Notably absent from subdivision (2) is any reference to police personnel who investigate unsolved crimes. This is because the statute restricts disclosure of DNA profiles kept in locations other than SDIS to “criminal proceedings.” A “criminal proceeding” is part of a criminal action (CPL 1.20 [18]). A criminal action is commenced by the filing of an accusatory instrument (CPL 1.20 [17]). Thus, DNA records held outside of SDIS can only be revealed “to the court, the prosecution, and the defense” when a criminal action has been commenced. This occurs only when the People have a person who is alleged to have committed a charged crime and does not relate to unsolved crimes where the perpetrator is unknown. Since in a criminal proceeding there is a known accused, the Legislature excluded police personnel. Police personnel have a need to know DNA information in unsolved crimes and not for solved crimes. By limiting disclosure of records in locations other than SDIS to a limited number of individuals and in the limited circumstance of a “criminal proceeding,” subdivision (2) of Executive Law § 995-d is a clear indication that the Legislature prohibited the comparison of defendant’s DNA contained in locations other than the State DNA identification index to DNA of unsolved crimes.
It is clear that the defendant is a person on whom DNA testing is performed. Thus, under Executive Law § 995-d (2), revealing his DNA profile is limited to the specified person in the statute and for the purpose of this criminal proceeding only. Under this subdivision, if there is a “cold hit,” OCME is prohibited from informing the police or the district attorney in *227 the county having jurisdiction over the “cold hit” crime. This indicates that crime scene DNA profiles are covered by subdivision (2) of Executive Law § 995-d, for there is no reason to permit unsolved crime scene DNA data to be compared to a defendant’s DNA profile if it cannot be revealed to proper authorities.
Chapter 524 of the Laws of 2002
The People claim that by enacting chapter 524 of the Laws of 2002, the Legislature implicitly approved of local databases containing DNA identification information about nonconvicted persons. Chapter 524 of the Laws of 2002, effective September 17, 2002, added a totally new paragraph (b) to Executive Law § 995-c (9). The section provides for a nonconvicted person to apply to the court to have certain DNA records expunged upon the happening of certain events. The People reason that if the Legislature provided for purging of records from local databases, it must recognize the legality of such databases. The argument is premised on the assumption that the new paragraph provides for removal of DNA identification information from local databases.
An amicus, at oral argument and in the brief, claims to have personal knowledge about the enactment of chapter 524 of the Laws of 2002. It is alleged that chapter 524 of the Laws of 2002 was passed because of the “O’Donnell case,” in which the State, because of the unique facts of that case, possessed records of Mr. O’Donnell, a nonconvicted person. Amicus claims that the new paragraph (b) of Executive Law § 995-c (9) refers to the expungement of certain records in the possession of the state and not of any local database.
Unfortunately, the court has been unable to obtain any legislative documentation about this paragraph. Nonetheless, reading the statute in its context and examining the meaning of the words contained in the new legislation, the court concludes that the new paragraph (b) refers exclusively to removal of records in the custody of New York State and makes no reference to OCME’s “linkage database” or any other local DNA identification information index.
First, as pointed out by the defendant, the entire Executive Law § 995-c refers only to data in the possession of New York State. It is section 995-d that refers to DNA data in the possession of local governments and private DNA laboratories. Every section in Executive Law § 995-c refers to the “state DNA identification index,” including subdivision (9). Thus, by plac *228 ing the new legislation in Executive Law § 995-c, the Legislature indicated that it was referring to records in the possession of the State.
Second, the terms used in Executive Law § 995-c (9) (both paragraphs) indicate that the DNA records referred to in the statute are records and samples, etc., kept by the State.[5] Executive Law § 995-c (9) (a) provides for automatic expungement of DNA index identification records of a person who was convicted but has the conviction overturned (not necessarily acquitted). The section also provides for the making of an application by such person to the court to expunge “any DNA record and any samples, analyses, or other documents relating to the DNA testing of such individual.” The phrase “any DNA record and any samples, analyses, or other documents” cannot refer to a computerized identification index, because those are covered by the automatic removal provision. Subdivision (9) (b)[6] has no automatic expungement of information in a computerized identification index. It does provide for application to the court to expunge “any DNA record and any samples, analyses, or other documents.” As indicated above, this phrase in subdivision (9) (a) does not refer to a computerized identifica *229 tion index. Where the same word or phrase is used in the same subdivision of a statute, the courts interpret them identically (see People v Romero, 91 NY2d 750, 755 [1998]; People v Bolden, 81 NY2d 146, 151 [1993]). Therefore, this section does not refer to OCME’s “linkage database.”
Executive Law § 995 defines the terms used in article 49-b of the Executive Law. Subdivision (8) of Executive Law § 995 defines the term “DNA record” as meaning DNA identification information “stored in the state DNA identification index.” By definition, the terms in Executive Law § 995-c (9) (b) refer to matters in the state system and not to DNA information stored in a local database. It is noted that when the Legislature wishes to refer to local databases it uses the phrase, as it did in Executive Law § 995-d (2), “other than a DNA record maintained in the state DNA identification index.”
In addition, courts should avoid interpreting a statute so as to raise constitutional questions (People v Pickett, 19 NY2d 170, 176 [1967]; People v Lo Cicero, 14 NY2d 374, 378 [1964]; McKinney’s Cons Laws of NY, Book 1, Statutes § 150, at 307-308). If this court would interpret Executive Law § 995-c (9) (b) to include local databases, substantial due process and equal protection issues would arise.
If the court were to include local databases under Executive Law § 995-c (9) (b) then a person never convicted of a crime who has been acquitted of all crimes must make an application to the court to expunge his or her DNA information. In contrast, a person who has been convicted of a designated crime and who has the conviction reversed but is not acquitted, automatically has his or her DNA information removed from a DNA identification index. There appears to be no rational basis for giving a previously convicted person greater rights than a non-convicted acquitee. The court finds that the People’s interpretation of Executive Law § 995-c (9) (b) jeopardizes the constitutionality of the statute.
If the court limits the application of Executive Law § 995-c (9) (b) to the information in the possession of the State, then no constitutional issue arises. The State prohibits the placing of DNA identification of nonconvicted persons on the SDIS. Therefore, there is no reason to provide for expungement of information about nonconvicted persons in the SDIS. The State may have other records of nonconvicted persons as allegedly happened in the O’Donnell case which require purging and those records are subject to application to the court.
The court finds that Executive Law § 995-c (9) (b) does not apply to OCME’s “linkage database.” There is no statute *230 providing for the records of a local database to be expunged under any circumstances. The logical explanation of this is that the Legislature believes that local DNA identification indexes are improper. Therefore, the People’s argument that the Legislature has implicitly, by its enactment of chapter 524 of the Laws of 2002, recognized the legality of the “linkage database” is rejected.
It is the Legislature which must decide whether to authorize the DNA testing of arrestees or indicted individuals. The Legislature is in the best position to balance all interests. This court, no matter how sympathetic it may be to the People’s interest, cannot alter the statutes, by engaging in judicial activism.
Reargument is granted; upon reargument the court adheres to its prior decision.

. Since that decision, two Federal District Courts have discussed the constitutionality of comparing DNA information of suspects with the DNA from unsolved crimes for which law enforcement lacks probable cause to believe that the suspect is involved (United States v Miles, 228 F Supp 2d 1130 [2002]; cf. Nicholas v Goord, 2003 WL 256774, 2003 US Dist LEXIS 1621 [SD NY, Feb. 6, 2003]). Both cases recognize that recent Supreme Court decisions have changed the law.

. Executive Law § 995-d reads,
*222 “1. All records, findings, reports, and results of DNA testing performed on any person shall be confidential and may not be disclosed or redisclosed without the consent of the subject of such DNA testing. Such records, findings, reports and results shall not be released to insurance companies ** * * agencies * * * and may not be disclosed in response to a subpoena or other compulsory legal process or warrant, or upon request or order of any agency, authority, division, office * * * or any other private or public entity or person * * *
“2. Notwithstanding the provisions of subdivision one of this section, records, findings, reports, and results of DNA testing, other than a DNA record maintained in the state DNA identification index, may be disclosed in a criminal proceeding to the court, the prosecution, and the defense pursuant to a written request on a form prescribed by the commissioner of the division of criminal justice services.” (Emphasis supplied.)

. Similarly, if OCME were excluded from the working of Executive Law § 995-d, then OCME could sell or distribute crime scene DNA profiles for any of numerous reasons that the Legislature has prohibited in this section. Indeed, OCME would be free to perform any of the numerous precluded activities.

. That subdivision reads, “2. Notwithstanding the provisions of subdivision one of this section, records, findings, reports, and results of DNA testing, other than a DNA record maintained in the state DNA identification index, may be disclosed in a criminal proceeding to the court, the prosecution, and the defense pursuant to a written request on a form prescribed by the commissioner of the division of criminal justice services.” (Emphasis supplied.)

. “9. (a) Upon receipt of notification of a reversal or a vacatur of a conviction, or of the granting of a pardon pursuant to article two-A of this chapter, of an individual whose DNA record has been stored in the state DNA identification index in accordance with this article by the division of criminal justice services, the DNA record shall be expunged from the state DNA identification index, and [the] such individual may apply to the court in which the judgment of conviction was originally entered for an order directing the expungement of any DNA record and any samples, analyses, or other documents relating to the DNA testing of such individual in connection with the investigation or prosecution of the crime which resulted in the conviction that was reversed or vacated or for which the pardon was granted.” (Emphasis supplied.)

. As is relevant, subdivision (9) (b) reads, “(b) As prescribed in this paragraph, if any individual, either voluntarily or pursuant to a warrant or order of a court, has provided a sample for DNA testing in connection with the investigation or prosecution of a crime and (i) no criminal action against the individual relating to such crime was commenced within the period specified by section 30.10 of the criminal procedure law, or (ii) a criminal action was commenced against the individual relating to such crime which resulted in a complete acquittal, or (iii) a criminal action against the individual relating to such crime resulted in a conviction that was subsequently reversed or vacated, or for which the individual was granted a pardon pursuant to article two-A of this chapter, such individual may apply to the supreme court or the court in which the judgment of conviction was originally entered for an order directing the expungement of any DNA record and any samples, analyses, or other documents relating to the DNA testing of such individual in connection with the investigation or prosecution of such crime.” (Emphasis supplied.)